UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM H. GRABSCHEID, SR. as assignee )
for the benefit of creditors of Netgov.com, Inc., )
a Delaware corporation, )
)
Plaintiff, )
)
v. ) No. 01 C 8480
)
E&A INDUSTRIES, INC., an Indiana corporation, ) Judge Rebecca R. Pallmeyer
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, William H. Grabscheid ("Plaintiff" or "Grabscheid"), is an assignee for the benefit of creditors of Netgov.com, Inc. ("Netgov"), a group of "e-commerce" companies that provide internet services to government entities. On July 31, 2000, Netgov purchased Competitive Government Strategies, LLC, a limited liability company of which Defendant E & A Industries, Inc. is a member. In addition to cash, Netgov issued common stock as consideration for the purchase, but entered into a "put agreement," which required Netgov to repurchase the stock at a set price if Netgov's financial circumstances declined. Netgov did lose value, and on February 14, 2001, E & A exercised its right under the put agreement, and quickly obtained a court order requiring Netgov to proceed with the repurchase. In this lawsuit, Plaintiff challenges the repurchase transaction and court order as a violation of Delaware corporate law and a fraudulent conveyance under Illinois law. Defendant now moves for summary judgment on all counts. For the reasons explained here, the motion is granted.

## FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 statements of material facts, as well as Plaintiff's complaint, and other documents in the record. The parties agree that there are no material facts in dispute, and that the issues before the court are issues of law. Until July

2001, when Netgov assigned its assets and property to Grabscheid, Netgov "was a citizen-to-government, government-to-government and e-commerce services provider." (Complaint ¶ 6.) In that capacity, Netgov and its subsidiaries delivered content over the internet and provided hosting and ASP services to third parties, particularly to government entities and its subsidiaries.[1] (*Id.*) According to Plaintiff, Netgov acquired these subsidiaries in 2000, through a series of corporate asset purchases, stock purchases, and mergers. (*Id.*)

One of these transactions was Netgov's July 31, 2000 purchase of the operating assets of CGS for $1.41 million. (*Id.* ¶¶ 7, Pl.'s 56.1 Resp. ¶ 3.) The CGS acquisition and related agreements were negotiated principally by Charles Stitt of CGS, Arif Ahmed of Netgov, and Ronald Wise, Chief Financial Officer and Secretary-Treasurer of E & A.[2] (Wise Aff. ¶¶ 3, 11, Ex. B to Def.'s 56.1.) As partial consideration for its purchase of the CGS assets, Netgov paid CGS $995,000 in cash. (Pl.'s 56.1 Resp. ¶ 3.) To cover the remainder of the purchase price, Netgov issued 388,889 shares of its common stock to CGS. Plaintiff alleges the stock had a par value of $.01, and an assumed value of $1.17 per share. (Complaint ¶ 9, Pl.'s 56.1 Resp. ¶ 3.) CGS simultaneously transferred 326,923 of the Netgov shares to Defendant. (Complaint ¶ 10.) Neither party explains why these shares were transferred to Defendant, or what CGS did with the remaining 61,766 shares.

Defendant claims that it was Netgov that insisted on issuance of stock for a portion of the purchase price, rather than proceeding with an all-cash transaction. Plaintiff denies this, (Pl.'s 56.1

---

[1] Plaintiff has not defined this term, but according to www.whatis.com, an ASP (or "application service provider") is a company that "offers individuals or enterprises access over the Internet to applications and related services that would otherwise have to be located in their own personal or enterprise computers."

[2] The court has not been made aware of the nature of CGS or E & A's business. CGS's website explains without elaboration that CGS was created to "answer questions" raised by "public employees and policy makers [who] are being asked to do more work with limited resources." www.cgstrategies.com

2

Resp. ¶ 4), but provides no clear alternate explanation. Instead, Plaintiff simply reiterates for the court the structure of the transaction between the parties, explaining that pursuant to the Netgov/CGS asset purchase agreement, CGS agreed to accept 388,889 shares of Netgov common stock as partial consideration for CGS's sale of its goodwill to Netgov. Plaintiff asserts, further, that Defendant agreed to accept Netgov stock pursuant to a "Liquidation Agreement" with Charles Stitt, the other member of CGS besides Defendant.[3] (Pl.'s 56.1 Resp. ¶ 4.) Neither party has provided the court with a copy of either the Netgov/CGS purchase agreement or the liquidation agreement between Stitt and E&A.

**Put Agreement**

Regardless whether it was CGS or Netgov that proposed the issuance of Netgov stock as part of the purchase price, it is clear that Defendant E & A was reluctant to take title to the shares without condition. Instead, Defendant insisted that Netgov execute a Put Agreement, which provided that Netgov would repurchase the shares at a price of $1.17 per share upon the occurrence of certain events. (Def.'s 56.1 ¶ 5.) The agreement states that "the execution of this Put Agreement is a condition of CGS's obligation to consummate the transaction set forth in the Asset Purchase Agreement," and recites that "[t]he parties desire to provide for the repurchase of the E & A shares [the 326,923 shares that were transferred from Netgov to CGS, and from CGS to E & A] by Netgov upon E & A's demand." (Put Agreement ¶¶ C, D, Ex. B to Def.'s 56.1.) Specifically, the Put Agreement provided that beginning six months from the closing date of the CGS acquisition (July 31, 2000), and continuing until Netgov either completed an IPO or engaged in a change-in-control transaction, E & A had the right to require that Netgov re-purchase all of the

---

[3] This is the language used by Plaintiff. The court is unaware of any other members of CGS, nor does the court know whether Stitt and E & A were equal partners.

Netgov stock held by E & A.[4] (*Id.* § 1.) If, before the six-month period expired, Netgov proposed to complete an IPO, engage in a change-in-control transaction, sell substantially all of its assets, or dissolve or liquidate, Netgov was required under the Put Agreement to notify Defendant. Under these circumstances, Defendant would be entitled to exercise its put rights, closing the resale of Netgov's stock 20 business days after E & A provided written notice of its intent to exercise its put rights. (*Id.* § 3.)

The Put Agreement provided, further, that if Netgov's average cash balance, as shown on its monthly balance sheet, fell below $3 million while Defendant owned any portion of the Netgov shares, Netgov would transfer an amount of cash equal to the purchase price of all of the shares into an escrow account as security in the event Defendant opted to exercise its rights under the agreement. (Put Agreement §5.) The parties agreed that "[t]he escrow agreement will confirm E & A's right to draw payment of the Purchase Price from the Escrow Account, in the event that Netgov fails to pay the Purchase Price to E & A upon exercise by E & A of put rights." (*Id.*) Netgov granted to E & A a first security interest in the amounts held in the escrow account. (*Id.*) Ronald Wise signed the Put Agreement for Defendant; a representative of Netgov (whose signature is indecipherable) also signed the agreement. (*Id.*)

Defendant explains that "[t]his provision ensured that E & A [sic] would have the cash to

---

[4] An "IPO" is defined in the Put Agreement as an "underwritten public offering of shares of common stock of Netgov, pursuant to which Netgov receives gross proceeds of at least $10,000,000 in such public offering." (Put Agreement § 1, Ex. B to Def.'s 56.1.) A "Change in Control Transaction" is defined as:

> [A]ny merger, share exchange, stock sale or other transaction engaged in by Netgov or its stockholders, pursuant to which the stockholders of Netgov immediately prior to such transaction cease to own at least fifty percent (50%) of the equity interests having the right to vote in Netgov or any successor entity or cease to have the power to elect a majority of the board of directors or members of the governing entity of Netgov or any successor entity after such transaction.

(*Id.*)

purchase the shares distributed to E & A, if E & A exercised its put."[5] The terms of the Put Agreement thereby operated like a demand note, according to Defendant, allowing Defendant to demand payment and requiring Netgov to hold proceeds in escrow if certain conditions were met. (Def.'s 56.1 ¶ 6.) Without the Put Agreement, Defendant claims it would not have accepted the Netgov shares as consideration for the sale of CGS. (Def.'s 56.1 ¶ 7.) Plaintiff again takes issue with Defendant's statement that it did not want Netgov stock, but does not otherwise explain the motivation for the Put Agreement, nor does Plaintiff challenge Defendant's characterization of the obligations imposed on Netgov by the Put Agreement. In support of his challenge to the repurchase transaction, Plaintiff Grabscheid characterizes the Put Agreement as an agreement to repurchase stock in the future, not an obligation given in consideration of a present transfer of stock. (Pl.'s 56.1 Resp. ¶ 6.)

**Enforcement of E & A's Put Rights**

E & A's concerns about Netgov's financial health were promptly realized. By January 2001, Netgov had incurred operating deficits reaching $40 million and liabilities in excess of $16 million. (Complaint ¶ 13.) The fair market value of Netgov's assets on January 31, 2001 was no more than $2 million, and Netgov lacked sufficient capital and assets to pay its debts as they became due. (Id. ¶ 14.) As of January 31, 2001, its cash balance fell below $3 million. (Def.'s 56.1 ¶ 8.) Defendant claims, and Plaintiff does not deny, that Netgov violated the Put Agreement by failing to timely disclose this information. (Def.'s 56.1 ¶ 8.) It is also undisputed that Netgov did not transfer cash into an escrow account as required by the Put Agreement. (Def.'s 56.1 ¶ 9.)

On February 14, 2001, Defendant sent a written notice to Netgov stating that "E & A Industries is exercising its put right and option under Section I of the [Put] Agreement to require that Netgov purchase all of the Netgov stock held beneficially and of record by E & A for the

---

[5] The court assumes Defendant meant to say Netgov when referring to the repurchase of Netgov stock.

Purchase Price set forth in Section 2 of the Put Agreement." (Complaint ¶ 15.) Neither Plaintiff nor Defendant identifies the individuals who sent or received this notice.

Apparently anticipating that Netgov would refuse this request, also on February 14, 2001, Defendant filed a "Verified Complaint for Preliminary and Permanent Injunctive Relief" in Indiana state court. (Complaint ¶ 15.) The complaint sought an order and judgment compelling Netgov to comply with the terms of the Put Agreement, to establish and fund an escrow account with $382,499.91 to be held in trust for Defendant, to take all steps necessary for Defendant to perfect a security interest in the escrow funds, and to otherwise comply with all terms of Section 5 of the Put Agreement. (*Id.*)

Netgov removed the state court action to the United States District Court for the Southern District of Indiana. (Def.'s 56.1 ¶ 11.) In its complaint, and in a motion for a preliminary injunction, Defendant contended that without the requested court intervention, it would suffer "irreparable harm" because Netgov would be "unable to satisfy any money judgment . . ." and that it would demonstrate that "Netgov is, or is close to being, insolvent and is in dire financial circumstances." (Complaint ¶ 16.) Neither party has submitted evidence of Netgov's insolvency, but Plaintiff does not challenge Defendant's assertions concerning the amounts of its liabilities, assets and capital as of January 2001.[6]

In its brief filed in opposition to E & A's Motion for a Preliminary Injunction, Netgov argued to the Indiana district court that if E & A were correct in its assessment of Netgov's financial situation, "Netgov's capital would likely be deemed impaired as defined by Delaware law. Accordingly, Delaware law would prohibit both Netgov from purchasing its stock and the courts

---

[6] Grabscheid claims in this court that Defendant represented in papers filed in the Indiana litigation that it wanted the escrow account funded because it wanted to continue to hold the Netgov stock. (Pl.'s 56.1 Resp. ¶ 5.) Defendant does not deny making this representation to the Indiana court, although elsewhere Defendant has claimed it did not want Netgov stock. (*See* Def.'s 56.1 ¶ 5.)

from enforcing a promise to do so." (Netgov's Brief in Opposition to E & A's Motion for Preliminary Injunction at 11, Ex. C to Def.'s 56.1 (citation omitted).) Defendant states that "[a]fter certain discovery and briefing on issues of Delaware law and other issues had been completed, the Indiana litigation was resolved through a February 27, 2001 Consent Order agreed to by the parties and issued by the Indiana District Court." (Def.'s 56.1 ¶ 12.) Plaintiff has not contested this statement.

**Consent Order**

The Consent Order, issued by the United States District Court for the Southern District of Indiana, provided, *inter alia*, that on February 28, 2001, Netgov would pay Defendant $100,000 in consideration for the conveyance by Defendant of 85,470 shares of Netgov common stock (par value $0.01) and an Assignment of Shares Separate from Certificate to Netgov. (Consent Order ¶ 5, Ex. B to Def.'s Motion for Transfer of Venue.) Defendant also agreed that when it received payment from Netgov, Defendant would deliver "Certificate No. 75," which represented 326,923 shares of stock, endorsed by a representative of Defendant, along with the Assignment. (*Id.*) Netgov agreed to submit a new certificate, number 109, to Defendant, representing 241,453 shares of stock. (*Id.*) The parties also agreed that on or before March 6, 2001, Netgov would pay Defendant $282,499.91 in consideration for Defendant's conveyance to Netgov of the 241,453 shares of stock represented in certificate number 109 and an Assignment for such shares. (*Id.* ¶ 6.) Netgov also agreed to pay Defendant $30,000 in attorneys' fees on or before March 16, 2001. Finally, Defendant agreed that upon payment of attorneys' fees, Defendant would return all Netgov financial information and business plans provided by Netgov and its attorneys since January 1, 2001. (*Id.* ¶¶ 7, 8.) The Consent Order contains no admissions of liability by either party.

By agreeing to the Consent Order, Defendant represented and warranted to Netgov that

Defendant was the owner of all shares of stock to be conveyed and that such shares are free of liens, claims, and encumbrances. (*Id.* ¶ 9.) The parties agreed that the Consent Order would supercede and void the Put Agreement. (*Id.* ¶ 10.) The Indiana district court retained jurisdiction to enforce the terms of the Consent Order until at least June 20, 2001. (*Id.* ¶ 12.) The Consent Order was signed by the attorneys for E & A and for Netgov. (*Id.* at 5.) Draft assignment instruments for the two quantities of shares were attached as exhibits A and B to the Consent Order with the headings "Stock Power." (*Id.* at 6, 7.) There is no evidence that Netgov or any of its representatives objected to the Consent Order before it was entered by the Indiana district court.

On February 28, 2001, Netgov transferred $100,000 from its account at LaSalle National Bank in Chicago, IL to Defendant's account at Bank One in Indianapolis, Indiana, and received in return an assignment of 85,470 shares of Netgov stock. (Complaint ¶ 19.) On March 6, 2001, Netgov paid $282,499.91 by wire transfer to Defendant, and received an additional 241,453 shares of stock. (*Id.*) On March 16, 2001, Netgov transferred $30,000 to Defendant as reimbursement for Defendant's attorneys' fees. (*Id.*) It is undisputed that Netgov's stock was valueless at the time of the transfers. (Complaint ¶ 19.) The Indiana district court ultimately dismissed the case with prejudice because no motion or request for enforcement of the Consent Order was filed on or before June 20, 2001. (Ex. C to Consent Order at 8, Ex. B to Def.'s Motion for Transfer of Venue.) This court has not been made aware of the date of dismissal.

**Trust Agreement**

It appears that Netgov's financial circumstances did not improve. On July 5, 2001, Netgov entered into a Trust Agreement and Assignment for the Benefit of Creditors with Plaintiff Grabscheid as Assignee/Trustee. (Def.'s 56.1 ¶ 14.) Netgov represented in the Trust Agreement that it planned to discontinue its business, and therefore assigned all of its assets and property to Plaintiff "so that the property so transferred may be expeditiously liquidated and the proceeds

8

thereof be fairly distributed to its creditors without any preference or priority, except such priority as is established and permitted by applicable law...." (Trust Agreement at 1, Ex. A to Def.'s 56.1.) The assignee's powers are set forth in section three of the Trust Agreement, and include, *inter alia*, the power to collect accounts receivable owing to assignor, to sell and dispose of all real and personal property of the assignor, to "settle any and all claims against or in favor of Assignor or its Subsidiaries . . . to sue or be sued, and to prosecute or defend any claim or claims of any nature whatsoever existing against or in favor of Assignor or its Subsidiaries," to pay Netgov's creditors according to a list of priorities, and finally "[t]o do and perform any and all other acts necessary and proper for the orderly liquidation or other disposition, including, but not limited to, abandonment, of the assets and property of Assignor or its Subsidiaries and the distribution of the proceeds derived therefrom to the creditors of Assignor or its Subsidiaries." (*Id.* §3(a)-(h).) Notably, the Trust Agreement reserves the rights of creditors against any of Netgov's sureties, and entitles creditors to sue third parties who may be liable to them. (*Id.* § 5.) The Trust Agreement provides that the trust shall be administered out of court, but grants the assignee power to seek a declaratory judgment or other such relief as necessary in connection with any dispute or claim arising under the Trust Agreement. (*Id.* § 6.)

**Current Litigation**

On November 5, 2001, Plaintiff filed a five-count complaint in the present action. In Counts I and II, Plaintiff claims that the Put Agreement (Count I) and Consent Order (Count II) violate Delaware corporation law and are unenforceable. (Complaint ¶¶ 21-28.) Counts III, IV, and V claim that the transfers made pursuant to the Consent Order violate Illinois' fraudulent transfer statutes. (*Id.* ¶¶ 29-41.) Defendant has moved for summary judgment on all counts, and has also moved for a transfer of venue to the Southern District of Indiana. For the following reasons, the court grants Defendant's motion for summary judgment on all five counts. Because summary

judgment is appropriate, it is unnecessary for the court to consider Defendant's motion for change of venue.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In considering a summary judgment motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *O'Connor v. DePaul University*, 123 F.3d 665, 669 (7th Cir. 1997). The court will grant summary judgment against a party who does not produce evidence that would reasonably permit the finder of fact to find in its favor on a material question. *McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir. 1995). As noted, the facts here are largely undisputed, and the dispositive issues are questions of law.

In Count I, Plaintiff argues that because Netgov's capital was impaired when Defendant exercised its put rights (February 14, 2001), the Put Agreement was unenforceable under Section 160 of the Delaware Corporation Law. (Complaint ¶¶ 23, 24.) In Count II, Plaintiff argues that Netgov's stock was impaired on February 27, 2001, when it agreed to repurchase the stock and pay Defendant's attorneys fees pursuant to the Consent Order, and thus asks this court to declare the unenforceability of the Consent Order under Delaware law. (Complaint ¶¶ 26-28.) Counts III through V charge that the transfers of stock for cash carried out pursuant to the Consent Order constituted fraudulent conveyances under Illinois law. (Complaint ¶¶ 29-41.) Count III charges that Netgov engaged in actual fraudulent transfer under Illinois law; Counts IV and V charge constructive fraudulent transfer under two other portions of Illinois' fraudulent transfer statutes. 740 ILCS § 160/5(a)(1) (Claim III), 740 ILCS § 160/5(a)(2) (Claim IV), 740 ILCS § 160/6(a) (Claim V).

Defendant argues that summary judgment should be granted on Counts I and II because Plaintiff's Delaware law claims are barred by the doctrine of *res judicata* (a doctrine also referred to as claim preclusion). With respect to Counts III through V, Defendant claims that Plaintiff, as assignee for the benefit of creditors, lacks standing to pursue fraudulent conveyance claims on behalf of Netgov's creditors. The court agrees that Counts I and II are barred by *res judicata*. For the reasons explained below, the court concludes that the fraudulent conveyance claims asserted by Plaintiff fail on their merits. Accordingly, the court will not reach the difficult issue of whether an assignee under a trust agreement as described above – which specifically reserves creditors' rights to creditors – nevertheless has standing to pursue a claim such as this.[7]

**Counts I and II**

In Counts I and II, Plaintiff seeks a declaration that the Put Agreement and the Consent Order, respectively, are unenforceable under Delaware law. (Complaint ¶¶ 21-28.) Plaintiff argues that because Netgov's stock was impaired at the time E & A exercised its put rights, and at the time it agreed to the terms of and the entry of the Consent Order, Netgov's obligations under both agreements are void. (*Id.*) Defendant argues that the Consent Order issued by the federal district court in Indiana bars this claim. The court agrees.

Because this court is sitting in diversity, Illinois choice of law rules govern the determination of which jurisdiction's law of preclusion to apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S.

---

[7] Defendant E & A argues that under Illinois law, an assignee for the benefit of creditors has no standing to challenge fraudulent conveyances on behalf of the assignor's creditors. Neither party has cited any recent case law that directly addresses the issue, perhaps because financially impaired firms are now more likely to seek bankruptcy protection than they are to make assignments for the benefit of creditors. At least some early Illinois case law seems to suggest Plaintiff might not have standing to pursue such claims. More recent opinions suggest that where a court appoints a receiver to marshal and distribute the assets of corporation, such a receiver might well have standing to challenge a transfer as a fraudulent conveyance. *Compare Bouton v. Dement*, 123 Ill. 142, 150, 14 N.E. 62, 65 (Ill. 1887) (assignee for the benefit of creditors is not the representative of the creditors and therefore cannot set aside fraudulent conveyances made by assignor) *with Scholes v. African Enterprise, Inc.*, 838 F. Supp. 349 (N.D. Ill. 1993) (court-appointed receiver had standing to assert fraudulent conveyance claims).

11

487 (1941). The Illinois choice of law rule is that "the collateral estoppel or *res judicata* effect of a judgment is determined by the law of the jurisdiction where the judgment is rendered." *Tuteur Associates, Inc. v. Taubensee Steel & Wire Co.*, 861 F.Supp. 693, 695-96 (N.D. Ill. 1994). Thus, because the prior action was in federal court, this court looks to Seventh Circuit law on *res judicata*, or claim preclusion.

"Under the federal common law of *res judicata*, a subsequent suit is barred if the claim on which it is based arises from the same incident, events, transaction, circumstances, or other factual nebula as a prior suit that had gone to final judgment." *Okoro v. Bohman*, 164 F.3d 1059, 1062 (7th Cir. 1999) (citations omitted). The doctrine prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding. *Brown v. Felsen*, 442 U.S. 127, 131 (1979). "*Res judicata* thus encourages reliance on judicial decisions, bars vexatious litigation, and frees the courts to resolve other disputes." *Id.* Claim preclusion applies where the following elements are present: (1) a final judgment on the merits in an earlier action, (2) an identity of the cause of action in both the earlier and later suit, and (3) an identity of the parties or their privies in the two suits. *See Tice v. American Airlines*, 162 F.3d 966, 970 (7th Cir. 1998), *cert. denied*, 119 S.Ct. 2395 (1999).

The Consent Order constituted a final judgment on the merits. The intent of the parties must have been to put to rest disputes over the meaning of the Put Agreement, as evidenced by the fact that the Consent Order substituted for and voided that earlier agreement. Significantly, the suit was dismissed "with prejudice," indicating that the order barred subsequent suits on the same cause of action. *See, e.g., Phillips v. Shannon*, 445 F.2d 460, 462 (7th Cir. 1971) ("'[A] dismissal with prejudice is a final judgment on the merits which will bar a second suit between the same parties for the same cause of action.'" (citations omitted).) Typically, a consent order will bar a new lawsuit arising from the same dispute in which the consent order was entered. *United States v.*

12

*Fisher*, 864 F.2d 434, 439 (7th Cir. 1988). Thus this court infers that the Indiana Consent Order was intended to settle once and for all this dispute between Netgov and E & A.

The court concludes that element two has also been met. What is crucial here is that "a single core of operative facts" formed the basis for both lawsuits. *Smith v. City of Chicago*, 820 F.2d 916, 918 (7th Cir. 1987). The acquisition of CGS by Netgov, the financing of the deal leading to the Put Agreement, Netgov's financial instability, and Netgov's refusal to voluntarily repurchase its stock, all led E & A to file suit in the Indiana court, and also form the basis for the current lawsuit. In fact, Netgov raised the Delaware law issue in a brief submitted to the Indiana district court and argued in that litigation that its stock was impaired. (Netgov's Brief in Opposition to E & A's Motion for Preliminary Injunction at 11-12, Ex. C to Def.'s Memorandum of Law in Support of Summary Judgment.) There is clearly an identity between the causes of actions in the former and the current lawsuit. Plaintiff does not argue the contrary.

Moving on to element three, Plaintiff argues that there is a lack of identity between Plaintiff and Netgov because "to the extent [Plaintiff] is a successor to Netgov, he is appearing in a different legal capacity in this action," i.e. as a creditor. (Plaintiff's Memorandum in Opposition to E & A's Motion for Summary Judgment at 3.) Significantly, Plaintiff has not explained how or why Netgov is indebted to him or to any creditor. In any event, the fact that Plaintiff himself may be a creditor is unrelated to the fact that he was appointed by Netgov as Netgov's trustee, and was endowed with the powers and duties described above. Regardless of how Plaintiff fashions himself, he was appointed by Netgov to serve as assignee, and as such *does* represent Netgov in this action, in which he challenges the repurchase transaction for the same reasons raised by Netgov in Indiana. *See Bouton v. Dement*, 123 Ill. 142, 150, 14 N.E. 62, 65 (Ill. 1887) ("The assignee is not the representative of creditors, but the agent of the assignor for the distribution of the property assigned.")

*Gray v. Lacke*, 885 F.2d 399 (7th Cir. 1989), cited by Plaintiff, is inapposite. The plaintiff

13

in that case had earlier brought suit against Dane County, Wisconsin, under 28 U.S.C. § 1983 and Title VII for sexual harassment and related claims and later sought to bring similar claims against county employees. *Id.* at 404. The Seventh Circuit held that *res judicata* did not bar a claim against city officials being sued in their *individual* capacities, but would bar suit against the same individuals in their official capacities. *Id.* at 405. Plaintiff's attempt to analogize to the present case, in which Plaintiff argues he is suing in his individual capacity, is not persuasive. Plaintiff is not suing in his individual capacity; rather, as stated in his Complaint, he is suing "as Assignee/Trustee for the benefit of creditors of Netgov.com . . . ." (Complaint at 1.) Because there is identity between the parties and the causes of action, and because the Indiana district court's dismissal of the case with prejudice constituted a final judgment on the merits, the court holds that *res judicata* prevents Plaintiff from litigating the Delaware law issues raised by Counts I and II. Had Netgov sought to challenge the Consent Order, it would have been required to do so by way of a motion for reconsideration or an appeal to the Seventh Circuit. Netgov's failure to do so would bar an independent challenge to the Indiana court ruling, and Plaintiff, who stands in Netgov's shoes, is similarly barred.

The court takes no position on the question whether Netgov's creditors, who were not parties to the Indiana litigation, may be entitled to assert claims under Delaware law against E & A, should they choose to do so.[8] Assuming the creditors have such rights, the court nevertheless

---

[8] Without deciding the matter, the court notes that the relevant provision of Delaware corporate law suggests such a challenge might be difficult to mount. Section 160 of the Delaware Corporation Law, which prohibits a corporation from purchasing its own shares when its capital is impaired, recognizes an exception:

> Nothing in this subsection shall invalidate or otherwise affect a note, debenture or other obligation of a corporation given by it as consideration for its acquisition by purchase, redemption or exchange of its shares of stock if at the time such note, debenture or obligation was delivered by the corporation its capital was not then impaired or did not thereby become impaired . . .

(continued...)

declines Plaintiff's invitation to substitute creditors as parties in this action. Federal Rule of Civil Procedure 17(a) is primarily a tool for defendants to protect against exposure to double liability. See Contract Buyers League v. F & F Investment, 300 F. Supp. 210, 230 (N.D. Ill. 1969) ("The real party in interest requirement is intended to insure that the contours of the litigation extend no further than the interests that apparently are necessary for the resolution of the controversy.") Plaintiff does not suggest that there is any such risk here, where his claims are being dismissed. Plaintiff has not been specific about the names or identities of any particular creditors, and this court presumes that any creditor seeking to challenge the transactions at issue would be free to file his or her own motion for leave to intervene or an independent lawsuit.

**Counts III, IV, & V**

Counts III through V allege that the transfers of stock for cash between Netgov and E & A constituted fraudulent conveyances, actual or constructive, under three provisions of Illinois law. Defendant argues that Plaintiff as assignee for the benefit of creditors does not have standing to pursue these claims. It is unnecessary for the court to determine whether Plaintiff has standing, however, because the court determines that all three counts fail on their merits.

Section 5 of the Uniform Fraudulent Transfer Act addresses transfers made with actual or constructive fraudulent intent. That section provides in pertinent part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1) with actual intent to hinder, delay, or defraud any creditor or the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

---

[8](...continued)
DEL. CODE ANN. tit. 8 § 160 (2001).

incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5.

With regard to his claim in Count III that the transfers violated section (a)(1), Plaintiff has provided no evidence that Netgov acted with the intent to defraud its creditors. In fact, it appears that quite the opposite is true. After entering into the Put Agreement, Netgov did not voluntarily repurchase its stock from E & A. To the contrary, Netgov's refusal to do so was the reason for the Indiana litigation: E & A sued Netgov to compel Netgov to buy back its stock. Pursuant to the Consent Order, Netgov did ultimately acquiesce in the Consent Order to proceed with the transaction, but the facts belie Plaintiff's contention that Netgov acted with fraudulent intent. There is simply no merit to Plaintiff's claim under section (a)(1), and therefore it should be dismissed.

As for section (a)(2) (the basis for Count IV), Plaintiff asserts that Netgov did not receive any value for his transfer. Defendant does not dispute this, although as noted, Netgov willingly entered into the Put Agreement on July 31, 2000 as part of a transaction in which Netgov purchased substantial assets. (Complaint ¶ 11.) The Consent Order required Netgov to repurchase the stock from E & A, as provided in the Put Agreement, agreed to by the parties approximately seven months earlier. Again, the fact that it took a lawsuit to move Netgov to repurchase its stock is inconsistent with any notion that Netgov intended to defraud or delay creditors or to incur debts beyond its ability to pay. Nor has Plaintiff provided any evidence showing that when Netgov entered into the Put Agreement, as a part of its acquisition of CGS, it contemplated that its remaining assets would be unreasonably small in relation to the transaction or business. For these reasons, the court concludes that no action may be maintained against E & A under section (a)(2).

Plaintiff's final claim is that the repurchase transaction constitutes a fraudulent transfer under Section 6 of the Fraudulent Transfer Act, which imposes liability for certain transfers without regard to the debtor's knowledge or intent. That section provides in relevant part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6(a). A cause of action under section 6(a) arises where "(1) the creditor's claim arose before the transfer, (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transferred property, and (3) the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer." *Berland v. Mussa*, 215 B.R. 158, 170 (N.D. Ill. 1997) (citations omitted). No actual proof of fraudulent intent is required. *Liquidation of Medcare HMO, Inc. v. Katten, Muchin & Zavis*, 294 Ill.App.3d 42, 50, 689 N.E.2d 374, 380 (1st Dist. 1997). The court finds that Plaintiff has failed to meet his burden here as well. Putting aside the fact that Plaintiff is actually suing as assignee for the benefit of creditors, and not as an individual creditor, Plaintiff has not even alleged that his claim (or that of any of Netgov's creditors) against Netgov arose before the transfer. Therefore element one is not satisfied.

Even if it were, the court does not believe Plaintiff can satisfy element two, which requires Plaintiff to show that Netgov did not receive reasonably equivalent value in exchange for the transferred property. Plaintiff contends that it did not, and it is undisputed that the stock was valueless at the time of the transfers pursuant to the Consent Order. The facts here show, however, that this transfer of stock for cash was in reality the completion of a contractual responsibility; or, viewed another way, an overdue payment, from Netgov to E & A, of the remainder of CGS's purchase price. Defendant has repeatedly asserted, without any real refutation from Plaintiff, that it agreed to accept shares of Netgov stock as part of the acquisition of CGS, only on condition that Netgov agreed to the terms of the Put Agreement. Under the Put Agreement, Netgov agreed to pay E & A $382,499.91 in order to repurchase its shares of stock, if its monthly balance sheet fell below $3 million dollars. Put agreements are not uncommon in

*Resolution Trust Corp. v. Cheshire Management Co., Inc.*, 18 F.3d 330, 332 (6th Cir. 1994) (discussing one party's business transaction, which included a put agreement, and which was structured to ensure it was supported by adequate consideration).

Netgov therefore "incurred the obligation" to repurchase its stock from E & A in January 2000. Plaintiff does not contend that the Put Agreement was invalid, and the Consent Order issued by the Indiana district court essentially ordered the parties to do what had been contemplated under that agreement. In this context, the fact that the stock was valueless in March 2001, at the time of the transfers, is irrelevant. The risk that it might be requested to purchase its shares at an inflated price was one that Netgov took in January 2000 when it bought CGS. Significantly, Netgov itself realized its deal had turned sour and attempted to evade its contractual obligations. Certainly the cash transfer called for by the terms of the Put Agreement may have caused problems for other creditors of Netgov. But these facts do not amount to constructive fraud. Nor will this court adopt Plaintiff's implicit theory that the Indiana district court would order the parties to engage in unlawful behavior.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. 17-1) is granted, and Counts I through V are dismissed. Because the court grants Defendant's motion for summary judgment, its motion for transfer of venue (Doc. 16-1) is denied without prejudice as moot.

ENTER:

Dated: December 18, 2002

REBECCA R. PALLMEYER
United States District Judge